

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| APEX OIL COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 04 C 46 |
| | ) | |
| v. | ) | Judge Mark Filip |
| | ) | |
| METROPOLITAN WATER | ) | |
| RECLAMATION DISTRICT OF | ) | |
| GREATER CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S PARTIAL SUMMARY JUDGMENT MOTION

Plaintiff, Apex Oil Company, Inc. ("Apex"), alleges a conversion claim (amongst others, at least in the second amended complaint) against Defendant, Metropolitan Water Reclamation District of Greater Chicago ("MWRD"). MWRD seeks summary judgment on the conversion claim based on five affirmative defenses grounded in various sections of the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("Tort Immunity Act"). *See* 745 ILCS 10/1-101 *et seq.* For the reasons explained below, the Court grants summary judgment to MWRD on the conversion claim.

### Factual Background

The relevant facts are taken from the parties' filings under Local Rule 56.1 ("L.R. 56.1"). The Court considers only those facts or additional facts that are presented in conformity with L.R. 56.1. [1]

---

[1] MWRD filed a statement of facts pursuant to L.R. 56.1(a)(3) with its motion for summary judgment. (D.E. 46 (The Metropolitan Water Reclamation District of Greater

Apex is a Missouri corporation with its principal place of business in St. Louis, Missouri. (D.E. 53 (Resp. of Apex Oil Co. to MWRD's Statement of Undisputed Material Facts (also "Apex Resp.")) ¶ 1.) Defendant, MWRD, is a municipal corporation created pursuant to the Illinois Metropolitan Water Reclamation District Act (70 ILCS § 2605/1 *et seq.*) with its principal place of business in Chicago, Illinois. (*Id.* ¶ 2.) MWRD owns real estate at 3301 South Kedzie Avenue, Chicago, Illinois, where six petroleum product storage tanks and other improvements (known as the "Torco Terminal") are situated. (*Id.* ¶ 5.)

Prior to September 2003, MWRD leased the Torco Terminal to Apex through a series of leases and general permits. (*Id.* ¶¶ 6-7.) Sometime during the leased period—after August 1, 1941, but prior to late 1995—the Torco Terminal was sold to Torco Oil Company ("Torco Oil"). (*Id.* ¶ 8.) Following this sale, Apex entered into an oral agreement with Torco Oil to rent one or more of the oil storage tanks at the Torco Terminal. (*Id.* ¶ 9.) Apparently, for the purposes of terminal operations, Torco Oil and Apex were considered the same entity. (*Id.* ¶ 8.) After renting the storage tanks at the Torco Terminal, Apex began to store petroleum products there, including "residual oil," known as No. 6 grade – a leftover product of crude oil after the more valuable hydrocarbons are removed through petroleum refinery operations. (*Id.* ¶¶ 9-12.)

In March 2003, MWRD commenced eviction proceedings against Apex (Torco Oil) in the Circuit Court of Cook County, Illinois. (*Id.* ¶ 21.) The Circuit Court of Cook County found that MWRD was entitled to possession of the premises located at 3301 South Kedzie Avenue in

Chicago's Statement of Undisputed Material Facts and Supporting Materials ("MWRD SF").) Apex filed a response to MWRD's statement of facts and a separate statement of additional facts as required by L.R. 56.1(a),(b). The procedural rules permitted MWRD to reply to the additional material facts set forth by Apex in the form prescribed in L.R. 56.1(b). According to the rule, "all material facts set forth in the statement filed pursuant to section (b)(3)(B) will be deemed admitted unless controverted by the statement of the moving party." MWRD failed to reply to Apex's statement of additional facts, and therefore all material facts set forth by Apex pursuant to the local rule will be deemed admitted by this Court.

Chicago; the Circuit Court of Cook County entered an Order for Possession on July 16, 2003, in favor of MWRD and against Apex. (*Id.* ¶ 22.) Pursuant to the Order of Possession, however, Apex (Torco Oil) was allowed to remain in possession of the Torco Terminal until September 14, 2003. (*Id.* ¶ 23.) In late August, prior to the date when MWRD was set to gain possession of the Torco Terminal, MWRD inquired whether Apex would be interested in taking over operation of the Torco Terminal. (*Id.* ¶¶ 23-24.) Apex responded in mid-September 2003 that it was not interested in operating or leasing the Torco Terminal from the MWRD. (*Id.* ¶ 25.) The Torco Terminal ceased operation on September 12, 2003. (*Id.* ¶ 31.) According to the Order of Possession, Torco Oil's possession of the Torco Terminal ended on September 14, 2003. (*Id.* ¶ 23.) As of that date, Apex still had a quantity of petroleum product stored in one or more of the Torco Terminal storage tanks. (*Id.* ¶ 26.) The parties discussed the removal of the remaining oil from the storage tanks on either September 12, 2003, or September 14, 2003. (*Id.* ¶ 27.) During this conversation, Kenneth Fenton on behalf of Apex and Susan Morakalis on behalf of MWRD agreed that Apex would remove its oil from the Torco Terminal at its sole cost, and that MWRD would issue a permit to that effect. (D.E. 54 (Apex's Statement of Additional Undisputed Material Facts and Supporting Materials ("Apex SAF")) ¶ 1.)[2]

In October, 2003, MWRD issued a proposed general permit which incorporated the agreed-to provision, allowing Apex to remove its petroleum from storage tanks at the Torco Terminal at its sole cost. (MWRD SF ¶ 28; Apex SAF ¶ 2.) In addition to the previously

---

[2] The Court deems this fact admitted for present purposes because MWRD failed to reply to Apex's statement of additional facts as required by Local Rule 56.1(a)(3). The "sanction for failing to reply is identical to that imposed for failing to respond: admission of the opposing party's factual contentions." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). The Court further notes that regardless of MWRD's failure to reply, the statement of additional fact alleged by Apex is substantiated by the affidavit of Kenneth Fenton. (Apex SAF, Fenton Affidavit ¶¶ 3-6.)

discussed provisions, the general permit conditioned the removal of Apex's oil upon the requirement that Apex "clean four above ground storage tanks, which contained its oil, to bare metal, wipe sample the tanks for PCB's, and if positive for PCB contamination, triple wash the tanks." (Apex SAF ¶ 2.[3]) Apex asserts that prior to the instant litigation, MWRD had never claimed that Apex had generated solid or hazardous wastes, such as tank bottoms, or even mentioned "waste." (*Id.* ¶ 4.) Apex also asserts that the storage of Apex's oil "cannot be conclusively presumed to have resulted in the generation of tank bottoms" (*id.* ¶ 7[4]), notwithstanding that Apex elsewhere admits that "generation of tank bottoms is inherent in the storage of residual oil." (D.E. 53 ¶ 14.[5]) Apex also makes various assertions about when any tank bottoms that may be attributed to Apex's clarified slurry oil would become "waste" under federal or state law. (*See, e.g.*, Apex SAF ¶¶ 6, 8-9.) It is unclear whether these assertions properly qualify as "statements of fact" within the meaning of Local Rule 56.1—*see, e.g., City of Country Club Hills v. U.S. Dept. of H.U.D.*, No. 99 C 7139, 2001 WL 1117276, at *1 (N.D. Ill. Sept. 17, 2001) (Leinenweber, J.) (striking various paragraphs of a Local Rule 56.1 statement and stating that the "paragraphs contained . . . conclusions of law that have no place in a

---

[3] The Court deems this fact admitted because MWRD failed to reply to Apex's statement of additional facts as required by Local Rule 56.1(a)(3). See discussion *supra*. MWRD alleges that the removal of Apex's oil was conditioned on Apex also removing petroleum wastes generated by Apex's oil storage. (MWRD SF ¶ 28.)

[4] The Court deems this fact admitted because MWRD failed to reply to Apex's statement of additional facts as required by Local Rule 56.1(a)(3). See discussion *supra*.

[5] The Court notes that any dispute in the record regarding this topic is not material under Illinois law concerning the affirmative defenses raised by MWRD.

statement of facts") (citing L.R. 56.1(b)(3)(B))—but the Court can assume for present purposes that Apex's views are correct.[6]

Apex refused to accept the conditions contained in the General Permit ("Permit"), (MWRD SF ¶ 29; Apex SAF ¶ 3), according to Apex, at least, for two reasons: (1) because MWRD had never claimed that Apex's Oil had caused waste prior to this litigation, and (2) because the removal of any potential tank bottoms does not require cleaning tanks to the bare metal as required by the Permit. (Apex SAF ¶¶ 4-5.) Apex subsequently demanded that it be allowed to remove its oil from the Torco Terminal. (*Id.* ¶ 3.) In response to this demand, MWRD refused such removal. (*Id.*[7]) In January 2004, Apex filed the instant lawsuit. (MWRD SF ¶ 30.[8]) As of April 14, 2005, the pumps, controls, boilers and other equipment necessary to operate the Torco Terminal and move oil to or from the storage tanks at the Torco Terminal had been vandalized by third parties to such an extent as to render them inoperable. (*Id.* ¶ 32.) Apex's conversion claim seeks damages in an amount in excess of $1,500,000. (D.E. 57 at 5.)

---

[6] Regardless of whether the tank bottoms were caused by Apex or not, and regardless of whether the tank bottoms constituted waste, both parties agree that tank bottoms are periodically removed from residual oil storage tanks. (MWRD SF ¶ 15; Apex Resp. ¶ 15.)

[7] The Court deems this fact admitted because MWRD failed to reply to Apex's statement of additional facts as required by Local Rule 56.1(a)(3). The Court further notes that the fact is supported by the record.

[8] In response to MWRD's statement of fact that Apex filed the lawsuit seeking, *inter alia*, the return of its oil at the Torco Terminal, Apex admitted this statement. The Court notes, however, that the motion for summary judgment and response in opposition of the motion were filed prior to the filing of Apex's Second Amended Complaint, in which Apex does not seek the return of its oil, but rather seeks damages in excess of $1,500,000.00, plus prejudgment interest, costs and reasonable attorneys' fees. (D.E. 57 (Second Amended Complaint) at 5.)

5

Analysis

I.    Legal Standard

Summary judgment is proper "where the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmovant, reveal that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact. *See Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Illinois precedent teaches that the applicability of the Tort Immunity Act is a question appropriate for summary judgment. *Moorehead v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 749 N.E.2d 443, 445 (Ill. App. Ct. 2001) (citation omitted).

II.   Applicability of the Illinois Tort Immunity Act

To prove the tort of conversion under Illinois law, "a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998) (citation omitted). As to conversion, Apex alleges the following:

> MWRD's actions in denying Apex possession of the Product and in failing to
> comply with its legal obligations to secure the Torco Terminal and prevent the

6

> unauthorized access and vandalism which has occurred has deprived Apex of the
> Product and rendered it commercially unreasonable to remove the Product from
> the Torco Terminal, which actions constitute MWRD's conversion of the Product
> of a value in excess of one million, five hundred thousand dollars
> ($1,500,000.00).

(D.E. 57 at 5.) MWRD interpreted these averments to mean that the culmination of three alleged

actions—(1) the issuance of a conditioned permit or alternatively the failure to issue an

unconditioned permit, (2) criminal vandalism of third-parties making oil removal commercially

infeasible, and (3) failure to enforce various laws—resulted in the conversion of Apex's property.

(D.E. 59 at 4-5.) Apex states in its response, however, that the conversion was complete when

"MWRD withheld possession of the oil after Apex demanded that it be allowed to remove it

from the Torco Terminal without agreeing to clean the tanks." (D.E. 55 at 2.) Therefore, the

issuance of the Permit with the condition that Apex clean the tanks, which Apex rejected and

MWRD refused to alter, was either sufficient to establish conversion (Apex's view) or necessary

to establish conversion (MWRD's view). In either event, the Court finds, upon consideration of

the facts in the light most favorable to Apex, that there are no genuine issues of material fact

regarding the application of MWRD's affirmative defenses under the Tort Immunity Act.[9]

A.    MWRD's Tort Immunity Under Section 2-104

The Supreme Court of Illinois abolished the doctrine of sovereign immunity in 1959. *See*

*Village of Bloomingdale v. CDG Enterprises, Inc.*, 752 N.E.2d 1090, 1095 (Ill. 2001) (citing

---

[9]    More specifically, Apex disclaims that the tort of conversion involved MWRD's failure to
prevent the commission of any crime (*e.g.*, the third-party vandalism) and MWRD's putative
failure to enforce any regulations of the U.S. Coast Guard. (*See* D.E. 55 at 2.) Given these
disclaimers, and given Apex's failure to respond to MWRD's arguments that it would enjoy
immunity under the Tort Immunity Act for any such alleged shortcomings—*see generally* 745
ILCS 10/2-103 (providing immunity for any local public entity for tort claims concerning a
"failing to enforce any law"); 745 ILCS 10/4-102 (providing immunity for any local public entity
for any tort claim concerning "failure to identify or apprehend criminals" or "failure to prevent
the commission of crimes")—the Court for present purposes at least views these issues as
resolved in MWRD's favor.

*Moliter v. Kaneland Community Unit Dist. No. 302*, 163 N.E.2d 89 (Ill. 1959)). The Illinois General Assembly thereafter enacted the Local Governmental and Governmental Employees Tort Immunity Act, which serves "to protect local public entities and public employees from liability arising from the operation of government." 745 ILCS 10/1-101.1(a); *accord, e.g.*, *Village of Bloomingdale*, 752 N.E.2d at 1095-96. Under this Act, "Illinois adopted the general principle that local governmental units are liable in tort, but limited this liability with an extensive list of immunities based on specific government functions." *Village of Bloomingdale*, 752 N.E.2d at 1095 (citation omitted).

MWRD first asserts immunity under section 2-104 of the Tort Immunity Act, which is also known as the licensing immunity doctrine. For the following reasons, this Court finds no genuine issues of material fact regarding the applicability of section 2-104, and concludes that summary judgment for MWRD is appropriate.

Section 2-104 of the Tort Immunity Act states:

"A local public entity is not liable for an injury caused by the issuance, denial, suspension, or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order or similar authorization where the entity or its employee is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked."

745 ILCS 2-104.[10]

The MWRD is authorized by state enactment to determine whether permits should be issued or denied under section 8 of the Metropolitan Water Reclamation District Act ("District Act"). 70 ILCS 2605/8. Section 8 authorizes the MWRD to:

---

[10] The parties to this case do not dispute that MWRD is a "local public entity" as defined by Section 1-206 of the Tort Immunity Act.

> grant easements and *permits* for the use of any such [leased] real property .
> . . which will not in the opinion of the board of trustees and general
> superintendent of the sanitary district interfere with the use thereof by the
> sanitary district for its corporate purposes. Such easements and permits
> *may contain such conditions* and retain such interests therein as considered
> in the best interests of the sanitary district by the board of trustees upon
> recommendation of the general superintendent.

70 ILCS 2605/8 (emphases added).

Under Illinois law, the alleged motives behind the issuance or denial of a permit, or alleged reasons that a local public entity decides to issue or deny a permit, are irrelevant to an analysis of the affirmative defense under section 2-104 of the Tort Immunity Act. *See Village of Bloomingdale*, 752 N.E.2d at 1097-98. In fact, the licensing immunity provision of the Tort Immunity Act has been broadly applied, even if the conduct of the governmental entity allegedly was based on "corrupt or malicious motives." *Id.*, 752 N.E.2d at 1098 (holding that "[i]f the legislature had intended to include an exception for 'corrupt or malicious motives,' it would have done so.").

Thus, in *Village of Bloomingdale*, the plaintiff, a real estate developer, alleged that the Village improperly denied its petition for rezoning and site plan approval, notwithstanding that the petition met all relevant requirements and the plaintiff had "spent heavily in reliance on its meetings with the Village." *Id.*, 752 N.E.2d at 1094. The plaintiff developer further alleged that the denial of its rezoning permit and site plan approval request was the product of a secret plan and conspiracy among village officials to steal their business opportunity so as to "help cronies of certain Village officials." *Id.* The result of this alleged misconduct was that the plaintiff lost several million dollars in costs and expected profits. *Id.* Notwithstanding these serious factual averments, the Illinois Supreme Court held, reversing the Illinois Court of Appeals, that the general

immunity provided by the Tort Immunity Act contained no exception for alleged "corrupt and malicious motives." *See id.* at 1097-98 ("[J]ust as the Act does not contemplate an exception to immunity for 'willful and wanton misconduct,' unless it expressly provides for such, the Act does not implicitly contemplate the common law exception for 'corrupt or malicious motives.'"); *id.* at 1098 ("[B]ecause the plain language of these provisions does not contain an exception for 'corrupt or malicious motives,' we will not insert one."); *accord, e.g., In re Chicago Flood Litigation*, 680 N.E.2d 265, 273 (Ill. 1997) (because the text of section 2-201 of the Tort Immunity Act contains no limitation of immunity for alleged willful and wanton misconduct, no such exception exists); *Harinek v. 161 North Clark Street Ltd. Partnership*, 692 N.E.2d 1177, 1184 (Ill. 1998) ("Even willful and wanton conduct, however, cannot deprive a municipality of an immunity granted by section 2-201 of the Act.") (citing *In re Chicago Flood Litigation*, 680 N.E.2d 265).

MWRD's issuance of the Permit conditioning the removal of Apex's oil from the Torco Terminal on the cleaning of the tanks is within the scope of the immunity provided to the MWRD by section 2-104 of the Tort Immunity Act. *See Village of Bloomingdale*, 752 N.E.2d at 1100 (holding that the action by the Village in denying the plaintiff's petition "falls squarely within section 2-104 of the [Tort Immunity] Act because the Village and its officials were authorized to either grant or deny [plaintiff's] petition for rezoning and site plan approval."). The District Act authorizes MWRD to condition permits "as considered in the best interests of the sanitary district." 70 ILCS 2605/8. The parties dispute whether the tank bottoms in the storage tanks at the Torco Terminal are properly considered "waste" under various environmental laws (and, in particular, when

they become "waste"). Apex also suggests at one point that the MWRD really did not think there was a colorable environmental waste issue, and that what the MWRD actually was trying to do was use the environmental issue as a fig leaf to impose the costs of cleanup on another party (*i.e.*, Apex) without having to use taxpayer funds for that purpose. (*See* D.E. 54 ¶ 4; *see also id.*, Ex. 1 (Fenton Aff.) ¶11 ("At no time did . . . anyone . . . from MWRD, ever claim that Apex had generated solid or hazardous waste in the nature of tank bottoms, or any other material, at the Torco Terminal. [. . . .] [The MWRD Board] wanted the tanks clean so they could cut them up and dispose of them and did not want taxpayers to bear the cost.").)

The Court can assume for present purposes that the disputed tank bottom materials do not constitute "waste" under the applicable laws until they are removed from the tanks and tested, as Apex suggests. Regardless of when the materials may be considered waste, MWRD asserts that it faced a "dilemma" – if Apex did not remove what MWRD believed to be waste generated by Apex's oil from the storage tanks, the wastes would be "abandoned on the District's property in contravention of section 21(e) of the Illinois Environmental Protection Act." (D.E. 45 at 8). This belief was substantiated by the sworn affidavit of Terrence A. Jagiello, a licensed professional engineer in the State of Illinois. (MWRD SF, Ex. H, ¶¶ 11-13.) Apex may dispute MWRD's analysis, and may even believe that it is simply an after-the-fact rationalization for an effort to save taxpayer money by unfairly denying a permit unless Apex would clean up the tanks, but such allegations pale by comparison to the allegations of conspiratorial misconduct and corruption that the Illinois Supreme Court in *Village of*

11

*Bloomingdale* found inadequate to undermine the otherwise applicable immunity. *See id.*, 752 N.E.2d at 1097-98.

Faced with this situation, the statutory text of the Tort Immunity Act and the District Act demonstrate that MWRD is properly immune from tort liability in the form of a conversion claim. *See* 745 ILCS 10/1-104 ("A local public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend, revoke, any permit, license, certificate, approval, order or similar authorization . . . ."). There is no genuine issue of material fact as to the licensing immunity doctrine asserted by MWRD as an affirmative defense pursuant to section 2-104 of the Tort Immunity Act. Summary judgment is therefore appropriate on this basis.

Apex argues alternatively that the Permit was not really a "permit," but a proposed contractual agreement. This argument is not persuasive because the Permit is repeatedly referred to in the record as a "permit" by both parties, and there is no breach of contract claim at issue in this case. In fact, even if MWRD had agreed to issue an unconditioned permit, revoked that permit, and replaced it with the conditioned permit, the Tort Immunity Act licensing provision would still apply. *See Village of Bloomingdale*, 752 N.E.2d at 1097-98.[11]

---

[11] At times Apex suggests that its conversion claim is a viable and winning one under cases such as *Centurian Reinsurance Co., Ltd. v. Singer*, 810 F.2d 140 (7th Cir. 1987), and *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284 (7th Cir. 1985). Neither of those decisions, however, dealt with a defendant who was covered by the Tort Immunity Act, nor was the Tort Immunity Act ever discussed in such cases. Therefore they do not control the analysis of the MWRD's putative defenses under well-settled principles of Illinois law concerning a municipal defendant making a permit or licensing decision.

B.    MWRD's Tort Immunity Under Sections 2-201 and 2-109

MWRD also argues that it is immune from liability on the conversion claim under

sections 2-201 and 2-109 of the Tort Immunity Act, which taken together codify the

"discretionary immunity doctrine." *In re Chicago Flood Litigation*, 680 N.E.2d at 272. Under

Illinois law, a municipality is immune from liability in its performance of discretionary tasks;

however, it cannot claim immunity for the improper performance of ministerial tasks. *See*

*Village of Bloomingdale*, 752 N.E.2d at 1099 (citing *In re Chicago Flood Litigation*, 680 N.E.2d

at 272).

Section 2-201 states:

"Except as otherwise provided by Statute, a public employee serving in a position
involving the determination of policy or the exercise of discretion is not liable for
an injury resulting from his act or omission in determining policy when acting in
the exercise of such discretion even though abused."

745 ILCS 10/2-201. Where section 2-201 is satisfied, such that a public employee would

not be liable, the local public entity is likewise immune from liability under section 2-109

of the Tort Immunity Act, which states that a "local public entity is not liable for injury

resulting from an act or omission of its employee where the employee is not liable." 745

ILCS 10/2-109.

The Illinois Supreme Court has explained that the relevant "employee's position

may involve either determining policy or exercising discretion, but the employee's 'act or

omission must be both a determination of policy and an exercise of discretion.'"

*Arteman v. Clinton Community Unit Sch. Dist. No. 15*, 763 N.E.2d 756, 763 (Ill. 2002)

(quoting *Harinek*, 692 N.E.2d at 1181); *accord Courson v. Danville Sch. Dist. No. 118*,

775 N.E.2d 1022, 1024 (Ill. App. Ct. 2002). The key question under section 2-201 is

whether the determination made by the public employee was a "discretionary policy

determination," *Arteman*, 763 N.E.2d at 764, which is a dual prong inquiry. Because the immunities afforded under the Tort Immunity Act operate as an affirmative defense, the government entities seeking to invoke the defense bear the burden of "properly raising and proving their immunity under the Act," *Van Meter v. Darien Park Dist.*, 799 N.E.2d 273, 280 (Ill. 2003), by establishing both elements necessary to invoke immunity under section 2-201: (1) a discretionary decision and (2) a determination of policy. *Id.* at 285-86.

With respect to the first prong, the act by MWRD is a discretionary act within the meaning of the principles established by Illinois caselaw. Cases applying the Tort Immunity Act recognize a distinction between discretionary duties and ministerial duties. A municipality is afforded immunity from liability for the performance of discretionary acts, but not ministerial acts. *Harrison v. Hardin County Community Unit Sch. Dist. No. 1*, 758 N.E.2d 848, 852 (Ill. 2001); *accord In re Chicago Flood Litigation*, 680 N.E.2d at 272. The Illinois Supreme Court has defined the terms "discretionary" and "ministerial" as follows: "[D]iscretionary acts are those which are unique to a particular public office, while ministerial acts are those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act." *Harrison*, 758 N.E.2d at 852 (internal quotation marks and citation omitted). Because there is no precise formulation to distinguish discretionary acts from ministerial acts, a determination must be made on a case-by-case basis, *Van Meter*, 799 N.E.2d at 280, considering things such as whether the decision: (1) is based on tailored statutory and regulatory guidelines that place constraints on the decisions of officials, *id.* at 281; (2) is "absolute, certain and imperative, involving

merely the execution of a set task, [with]…nothing remain[ing] for judgment or discretion," *Village of Bloomingdale*, 752 N.E.2d at 1099 (quoting *In re Chicago Flood Litigation*, 680 N.E.2d at 272); or (3) is the "exercise of personal deliberation and judgment in deciding whether to perform a particular act, or how and in what manner that act should be performed." *Wrobel v. City of Chicago*, 742 N.E.2d 401, 405-06 (Ill. App. Ct. 2000) (collecting cases).

As discussed above, in *Village of Bloomingdale*, the Supreme Court of Illinois found that the Tort Immunity Act's discretionary immunity doctrine barred liability for the Village of Bloomingdale's alleged corrupt and malicious decision to deny the plaintiff real estate developer a rezoning permit and site plan approval. *Id.*, 752 N.E.2d at 1099-1100. The Illinois Supreme Court also expressly rejected the contention that "the grant or denial of a zoning petition [was] a ministerial, as opposed to a discretionary, task under a tort theory of liability." *Id.* at 1100. The Illinois Supreme Court explained that "ministerial action" involved duties that were "'absolute, certain and imperative, involving merely the execution of a set task, and when the law which imposes it, prescribes and defines the time, mode and occasion of its performance with such certainty, that nothing remains for judgment or discretion.'" *Id.* at 1099 (quoting *In re Chicago Flood Litigation*, 680 N.E.2d at 272)). The Illinois Supreme Court held that the decision to grant or deny a zoning petition or site plan approval proposal fell outside this definition of "ministerial" acts and instead fell within the scope of the discretionary immunity doctrine. *Id.*, 752 N.E.2d at 1099-1100.

*Village of Bloomingdale* is the most relevant precedent of the Illinois Supreme Court, and it dictates a ruling in favor of MWRD on the discretionary immunity defense

here. In the instant case, the District Act is the enactment guiding MWRD's decision-making. *See* 70 ILCS 2605/8. This section of the District Act permits MWRD to condition permits concerning MWRD property "as considered in the best interests of the sanitary district." 70 ILCS 2605/8. This language does not cabin the decision-making of the MWRD in a manner that would put it into the "ministerial" category, nor does the language merely authorize "'the execution of a set task'" with nothing left to judgment or discretion. *Village of Bloomingdale*, 752 N.E.2d at 1099 (quoting *In re Chicago Flood Litigation*, 680 N.E.2d at 272). Moreover, the decision whether to grant permits concerning MWRD land is a decision unique to the particular office of MWRD administration. To the extent that Apex asserts that the MWRD's decision to deny an unconditional permit was tainted by bad faith motives, that assertion falls to settled Illinois precedent which does not limit the otherwise applicable immunity provided by the Tort Immunity Act when the plaintiff alleges "corrupt and malicious" motives, or "willful and wanton" misconduct.

Other precedent of the Illinois courts confirms this result. For example, in *Arteman v. Clinton Community Unit Sch. Dist. No. 13*, 763 N.E.2d 756 (Ill. 2002), the Illinois Supreme Court held that the discretionary immunity doctrine barred liability when a student sued his high school for failing to provide allegedly necessary safety equipment relating to rollerblading activities in gym class, which student was hurt while undertaking the activity. *Id.* at 764. The Illinois Supreme Court accepted the appellate court's position that "section 2-201 [of the Tort Immunity Act] provided immunity because the selection and modification of specific athletic equipment involve a degree of discretion" and policymaking. *Id.* at 763 (internal quotation marks and citation omitted).

16

Similarly, in *In re Chicago Flood Litigation*, the Illinois Supreme Court held that the discretionary immunity doctrine barred liability against the City of Chicago for its alleged failure to adequately supervise the driving of piles by a third-party, which failure allegedly led to massive flooding that harmed the plaintiffs. *Id.*, 680 N.E.2d at 273. The Illinois Supreme Court explained that

> In the present case, the contract between the City and Great Lakes [the third-party] provided that "the contractor shall not drive the piles at any other location than that specified by the City," and authorized the City to change its specifications. Thus, the City retained the discretion to locate the pilings in any location it thought best. This was a matter within the City's discretion for which there is immunity under [section 2-201 of] the [Tort Immunity] Act.

*Id.* at 273 (citation omitted).

To take just one more example at length, in *Harinek v. 161 North Clark Street, Ltd. Partnership*, 692 N.E.2d 1177 (Ill. 1998), the Illinois Supreme Court held that the discretionary immunity doctrine barred liability against the city fire department and fire marshal, after the plaintiff had been injured in a fire drill planned and supervised by the fire marshal. Notwithstanding that the plaintiff alleged that the fire marshal's conduct was willful and wanton, the Illinois Supreme Court held that the fire marshal's planning and conducting of a fire drill, which unfortunately involved placement of plaintiff behind a heavy door that struck the plaintiff when someone else opened it during the drill, was protected by the discretionary immunity doctrine. *Id.* at 1179. Because the fire marshal's planning and execution of fire drills involved the exercise of "discretion in determining how, when, and where to hold drills such as the one in which plaintiff was injured," the fire marshal's conduct "clearly constituted an exercise of discretion" protected by the discretionary immunity doctrine. *Id.* at 1182. Other similar examples abound in the Illinois caselaw. *See, e.g., Harrison*, 758 N.E.2d at 853 (holding that a principal's

17

decision not to allow a student to leave early so as to avoid snowstorm, which student was later involved in car accident, was a discretionary decision meriting immunity because the principal needed to balance the student's request and desire to leave early with the school's interest in an orderly dismissal); *Courson*, 775 N.E.2d at 1026 (Ill. App. Ct. 2002) (holding that discretionary immunity doctrine precluded liability against school shop teacher who allegedly made improper decision to remove safety shield from shop machine, because "[a] shop teacher in warning students and providing safety equipment has to consider each student's abilities, balance these interests against the resources available, and make a judgment how best to perform his teaching duties."); *Wrobel*, 742 N.E.2d at 406 (holding that a worker's efforts in repairing a pothole represented an exercise of discretion meriting immunity because "[t]he degree to which a pothole should be prepared, and specifically how much loose asphalt and moisture will be removed, is a matter of a worker's personal judgment, and encompassed within that judgment are the policy considerations of time and resource allocation during a given workday.").

In the interests of completeness, the Court notes, with respect to the second prong of the discretionary immunity doctrine, that MWRD's decision to issue the Permit with the aforementioned condition is a policy determination within the meaning of Illinois caselaw. Illinois courts have defined policy decisions as "those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests." *Harinek*, 692 N.E.2d at 1181 (internal quotation marks and citation omitted); *accord, e.g.*, *Wrobel*, 742 N.E.2d at 405 (collecting cases). Apex may believe that MWRD's policy decision concerning the permit—*i.e.*, conditioning it on certain remediation and/or clean-up—was ill-advised, or

perhaps even done for malicious and corrupt purposes, but under the Illinois caselaw, it is a policymaking decision. *Accord, e.g., Village of Bloomingdale*, 752 N.E.2d at 1099-1100; *Harrison*, 758 N.E.2d at 474; *Harinek*, 692 N.E.2d at 1182.

The Court notes that Apex obviously believes the immunity afforded by the Tort Immunity Act is inequitable and overbroad. The Illinois courts have expressed the view that some of the outcomes dictated by the Tort Immunity Act may strike some or perhaps even many people as unjust or unfair. *See, e.g., Arteman*, 763 N.E.2d at 764-65; *Courson*, 775 N.E.2d at 1026. Nonetheless, the courts of the State of Illinois have repeatedly expressed the view that they lack the authority to recalibrate the immunity provided by the Illinois General Assembly—*see, e.g., Arteman*, 763 N.E.2d at 765; *Village of Bloomingdale*, 752 N.E.2d at 1098—and this Court certainly has no more authority to interfere with the results prescribed by the Illinois legislature for Illinois law.

In summary, there are no disputed material facts concerning the applicability of the licensing immunity provision and the discretionary immunity provision in this case. Section 2-104, the licensing immunity provision, provides immunity for MWRD's decision to issue a permit conditioned upon tank cleaning, or in the alternative its decision to refuse to issue an unconditioned permit. Likewise, the discretionary immunity doctrine, set forth in sections 2-201 and 2-109 of the Tort Immunity Act, provides immunity because MWRD's decision to issue a conditioned permit was a policy determination and an exercise of discretion. As previously explained, such immunities attach under Illinois law, irrespective of whether Apex would allege that the MWRD acted with willful and wanton disregard of its rights, or whether Apex would allege that

the MWRD acted with corrupt and malicious motives. Summary judgment is warranted as to the conversion claim on each of these independent and alternative grounds.

C. Constitutionality Argument

At the conclusion of its response to MWRD's summary judgment motion, Apex suggests in passing that should MWRD prevail, the Tort Immunity Act is unconstitutional under both the Illinois Constitution and the United States Constitution because it would deny Apex the right to its property without due process of law. This argument fails for the following reasons. First, the Illinois Supreme Court of Illinois has stated that a "strong presumption of constitutionality attaches to legislative enactments." *Rose v. Pucinski*, 746 N.E.2d 800, 804 (Ill. App. Ct. 2001) (citing *Best v. Taylor Machine Works*, 689 N.E.2d 1057 (Ill. 1997)). Thus, "[t]he party who challenges a statute's constitutionality bears the heavy burden of clearly establishing the violation alleged." *Rose*, 746 N.E.2d at 804 (citing *People v. Jeffries*, 646 N.E.2d 587 (Ill. 1995)); *accord, e.g.*, *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993) (teaching that "[a] statute is presumed constitutional," when speaking of Kentucky statute subject to constitutional challenge); *Barnes v. Chicago Housing Authority*, 761 N.E.2d 283, 298 (Ill. App. Ct. 2001) (citation omitted) (statute presumed constitutional and challenger bears heavy burden).

Apex fails to meet this burden. Apex cites only *Cramp v. Board of Public Instruction of Orange County, Florida*, 368 U.S. 278 (1961), a case about the constitutionality of a Florida anti-communism loyalty oath, for the proposition that it has standing to challenge the constitutionality of the Tort Immunity Act. In *Cramp*, the Supreme Court held that a school teacher had standing because a Florida statute requiring

employees to take an oath that they had never "knowingly lent their aid, support, advice, counsel, or influence to the Communist Party," "unequivocally require[d] the [teacher] to execute the oath or suffer immediate discharge from public employment." 368 U.S. at 283, 285. The Court ultimately held that the Florida statute was unconstitutionally vague and therefore a denial of due process of law. 368 U.S. at 287. Apex's argument, in contrast, fails to articulate at a meaningful level how Illinois's provision of municipal immunity under certain circumstances is a cognizable constitutional violation. *See Barnes*, 761 N.E.2d at 298 (reasoning that the plaintiffs' equal protection and due process claims were unavailing because they failed to "enlighten us in a comprehensible manner on how the alleged violations violate anything – especially the constitutions."). Because this Court declines to speculate as to what Apex's arguments might be, Apex failed to meet its heavy burden, and its due process argument likewise must fail.

Second, even if the Court were to speculate about Apex's putative constitutional challenge, it would appear to fail. The historical baseline in the law is that sovereigns and government entities enjoyed sovereign immunity, so it is difficult to see how it would be constitutionally intolerable for Illinois to effect that same result in a smaller subset of cases via the Tort Immunity Act. Furthermore, to the extent this subject has been canvassed in Illinois caselaw, the Illinois Supreme Court noted that the current Illinois Constitution (*i.e.*, the Constitution of 1970), abolished sovereign immunity in Illinois "'[e]xcept as the General Assembly may provide by law,'" *Village of Bloomingdale*, 752 N.E.2d at 1095 (quoting Ill. Const. 1970, art. XIII, § 4), which means that today in Illinois "the tort liability of a local public entity or employee is expressly controlled both by the constitutional provision and by legislative prerogative as embodied in the Tort

Immunity Act." *Id.* (citation omitted). As a result, it is difficult to see how the Illinois Constitution could be violated if the legislature acts upon the power expressly conferred to it and enacts the Tort Immunity Act, which as explained above, warrants summary judgment in favor of MWRD. For all of these reasons, Apex's barebones and conclusory constitutional challenge is respectfully rejected.

### Conclusion

For the reasons stated above, MWRD's summary judgment motion is granted concerning Apex's conversion claim.

So Ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: _3-3-06_